635 So.2d 474 (1994)
Winston W. GLASCOCK, Plaintiff-Appellee,
v.
GEORGIA-PACIFIC CORPORATION, Defendant-Appellant.
No. 25677-CA.
Court of Appeal of Louisiana, Second Circuit.
March 30, 1994.
*475 Kean, Miller, Hawthorne, D'Armond, McCown & Jarman by Brian F. Blackwell and Cynthia M. Chemay, Baton Rouge, for defendant-appellant.
Travis M. Holley & Associates by Travis M. Holley, Bastrop, for plaintiff-appellee.
Before SEXTON, NORRIS and BROWN, JJ.
NORRIS, Judge.
Mr. Winston Glascock filed a claim for worker's compensation on September 12, 1991 for a shoulder injury which occurred on June 1, 1990. The administrative hearing officer overruled appellant Georgia-Pacific Corporation's exception of prescription, finding that Glascock's injury did not become disabling until September 17, 1990, and awarded him temporary total disability benefits of $276 per week from September 15, *476 1990 through January 25, 1991, and thereafter, supplemental earnings benefits (SEBs) of $888.09 per month. Georgia-Pacific appeals the hearing officer's ruling on its exception of prescription and the award of SEBs. For the reasons expressed, we affirm.

Facts
Glascock is a 50 year old with low average intelligence, poor literacy, a tenth grade education (he later earned his GED with some difficulty), and has performed predominantly unskilled manual labor throughout his life. He held various unskilled positions during his 13-year employment with Georgia-Pacific and its predecessor Olinkraft. While working as a laminator helper in the finishing department, he developed severe pain in both wrists. By early 1990, the pain caused him to change to a lower-paying position making pallets. In June 1990, Glascock sustained a shoulder injury when he fell from a railroad car and grabbed a ladder with his left hand. He stated in deposition that he felt immediate pain, but was able to resume his job duties after approximately 30 minutes. Glascock Dep., June 9, 1992, p. 12. For this reason, he did not report the accident when it occurred. He also stated that he felt pain that evening, but "didn't pay much attention to it."
He worked through the pain, which worsened in the evenings. Eventually, on August 7, 1990, Glascock saw Dr. Warren Daniel for the shoulder pain. According to Glascock, Dr. Daniel gave him pain pills and he went back to work the next day. Still suffering pain, he then went to the emergency room at Glenwood Regional Medical Center on September 7 and saw Dr. Teri O'Neal, who diagnosed fibromyalgia and told him to apply heat and wear a sling for two days. Dr. O'Neal believed that Glascock could return to work on September 11. On September 10, Glascock saw Dr. Sidney Bailey who diagnosed tenderness in the subdeltoid bursa and injected the area with a local anesthetic and cortisone. Dr. Bailey told him to return to work the next day. Over the next few days, the pain became more severe, radiating down his entire arm. Glascock worked until September 14 when he was no longer physically able to perform his duties at Georgia-Pacific; he has not worked since. On September 17, Glascock was admitted to Glenwood where he was treated by Dr. Sidney Bailey and remained for four days. Dr. Bailey conducted numerous tests, including two MRIs, cervical spine x-rays, bone scan and arthrogram, but all proved negative. It was not until December 1990 that an incomplete tear of the shoulder rotator cuff tendons and a torn glenoid labrum were diagnosed and the frayed tendons and torn labrum were removed. Since the surgery, he has regained 90 percent of the normal range of motion in his shoulder. According to Dr. Bailey, he presently suffers from a 10 percent residual disability in his shoulder and has certain physical restrictions. At the end of January 1991, Dr. Bailey suggested that he perform only light sedentary activities below shoulder height. Even after additional strengthening, Dr. Bailey recommended that he lift no more than an occasional 15-20 pounds and frequent 5-10 above shoulder height. In Dr. Bailey's opinion, Glascock should not lift anything over 20 pounds above shoulder height.
Georgia-Pacific sent Glascock to Paul Procell, an occupational therapist, for an evaluation of his present physical abilities. Mr. Procell also noted certain physical limitations and suggested that he lift and handle 30 pounds only occasionally (0-33% of an 8 hour work day), 15 pounds frequently (34-66%) and 5-7 pounds constantly (67-100%). He imposed no restrictions on sitting, standing or walking in general.
Georgia-Pacific also requested an evaluation from Faerie Sledge, a disability case manager for Conservco, regarding work available to Glascock with his present disability. Ms. Sledge found that based on his past employment history, education, age, and the labor market in general, he could return to other unskilled, minimum wage, light duty work available in his geographic area.

Action of the hearing officer
On December 18, 1991, the hearing officer overruled Georgia-Pacific's exception of prescription, finding that Glascock sustained a developmental injury and his shoulder pain did not become disabling until September 17, *477 1990. Glascock's shoulder claim was never actually tried; it was submitted based on the transcript and proffers from a previously held hearing regarding his worker's comp claim for carpal tunnel syndrome, which he developed while working as a laminator helper at Georgia-Pacific.
In that case, the same hearing officer found Glascock temporarily and totally disabled from September 15, 1990, through January 15, 1991. The decision was based solely on Glascock's hand and wrist injuries; the hearing officer refused to consider any evidence pertaining to the shoulder injury. The hearing officer ordered Georgia-Pacific to pay Glascock $276 per week for the term of the carpal tunnel disability, related medical expenses, legal interest and costs and penalties, but declined to award SEBs based on a physician's testimony that he had sufficiently recovered from the carpal tunnel injuries and could return to his job making pallets. In an unpublished opinion, No. 24,203-CA, we upheld the finding that SEBs were not warranted "in light of the conflicting evidence regarding plaintiff's continued disability and his capacity for performing light duty work involving the repetitive use of his hands."
Similarly, in the instant case, after considering evidence regarding the shoulder injury, the hearing officer ordered Georgia-Pacific to pay temporary total disability benefits from September 15, 1990 through January 25, 1991 with credit for prior benefits paid. However, she specifically found that after January 25, the shoulder injury prevented Glascock from performing his pallet-making job, and he was only able to return to light duty, minimum wage work earning significantly less than 90 percent of his pre-accident wages. She awarded SEBs of $888.09 per month until he is physically capable of earning 90 percent of pre-accident wages or 520 weeks and all related medical expenses.
Georgia-Pacific appeals, asserting first, that Glascock did not suffer a developmental injury within the meaning of La.R.S. 23:1209 because he knew immediately after the accident that he was injured, and second, that he was not entitled to SEBs because he failed to prove that he was unable to earn 90 percent of his pre-injury wages.

Prescription
The findings of an administrative hearing officer in a worker's compensation case are subject to the same standard of review as a district court. Key v. Insurance Co. of N. Amer., 605 So.2d 675 (La.App.2d Cir.1992). We will not set aside a hearing officer's factual findings or reasonable inferences unless they are clearly wrong or manifestly erroneous. Rosell v. ESCO, 549 So.2d 840 (La.1989).
Generally, La.R.S. 23:1209 A provides that all comp claims must be filed within one year of the accident. There is an exception to this rule, however, when the injury does not "result at the time of, or develop immediately after the accident." In this instance, the claim must be filed within one year of the time that the injury "develops." All actions are limited by a maximum two-year period. The Louisiana Supreme Court has addressed this provision on numerous occasions and consistently given it a liberal construction.
Development of the injury actually means development of disability, and disability marks the time from which the employee can no longer perform the duties of his employment in a satisfactory manner. Mottet v. Libbey-Owens-Ford Glass Co., 220 La. 653, 57 So.2d 218 (1952); Johnson v. Cabot Carbon Co., 227 La. 941, 81 So.2d 2 (1955); Wallace v. Remington Rand, Inc., 229 La. 651, 86 So.2d 522 (1956); Harris v. Seaboard Fire & Marine Ins. Co., 337 So.2d 262 (La. App.2d Cir.), writ. denied, 339 So.2d 853 (1976); 14 La.Civil Law Treatise, W. Malone & H. Johnson (1980), § 384. Often, this point in time will coincide with the date on which the employee ceases his employment with the employer. Swearingen v. Air Products & Chemical, Inc., 481 So.2d 122 (La. 1986).
Georgia-Pacific contends that the court erred in finding that Glascock's injury "developed" at some later date because he felt immediate pain following the accident and some pain thereafter. Such an argument, however, defies the interpretation given R.S. 23:1209A by the courts of this state. It is clear that development, as applied to a *478 compensable injury, signifies something more than occurrence and pain. It connotes the time when disability to perform work becomes manifest either to the injured employee or his employer. Wallace v. Remington Rand, Inc., supra. The underlying rationale of this rule is that an employee who becomes disabled after the prescriptive year (but within two years after the accident) will not be penalized by the loss of his compensation rights, unless he fails to bring suit to enforce them within one year after it is manifest, rather than conjectural, that he has a compensable claim. Bolden v. Georgia Casualty and Surety Co., 363 So.2d 419 (La.1978); Mottet v. Libbey-Owens-Ford Glass Co., supra.
Applying the above cited principles to the facts of the instant case, we find no manifest error in the hearing officer's implicit conclusion that Glascock's injury did not develop until September 17, 1990. Glascock stated in deposition that immediately after the accident his shoulder "hurt like the devil for a few minutes and it quit hurting when I went ahead and done my job like I was supposed to." Glascock testified that the pain interfered, to some extent, with his job duties, causing him to favor his right arm. However, the pain was usually worse at night and he was able to substantially perform all of his regular job duties until he was admitted to the hospital on September 17.
Georgia-Pacific argues that because Glascock saw three doctors prior to his hospitalization, he knew that he was injured and had a compensable claim shortly after the accident. See Kerr v. Jefferson Truck Lines, 389 So.2d 729 (La.App. 4th Cir.1980). However, not one of these doctors ever gave Glascock reason to believe that he could no longer perform the duties of his employment. It did not become manifest to Glascock until he was admitted to Glenwood suffering severe pain in his neck and shoulder and was required to undergo numerous diagnostic tests. Glascock's injury was certainly not manifest to Georgia-Pacific before September 17; there is no record evidence that he was unable to satisfactorily perform his duties at any time prior to this date. In addition, Glascock did not stop working until three days before he was hospitalized.
The policy in cases such as this is to encourage rather than penalize an employee who seeks to continue working despite what, in legal contemplation, turns out to be a disability. Johnson v. Cabot Carbon Co., supra; Loud v. Dixie Metal Co., 475 So.2d 122 (La.App. 2d Cir.1985). In Loud, supra, on facts similar to the instant case, we reversed the trial court's finding that the claimant's comp claim had prescribed even though he had seen numerous doctors prior to the actual diagnosis of disability. Loud was injured at work on February 18, 1982 but did not file suit until August 19, 1983. However, because his physicians were "unable to diagnose any specific organic problem," until January 1983, we found that Loud continued to work without full apprehension of the seriousness of his condition and that he reasonably assumed his condition might eventually improve.
We addressed the "development of injury" rule more recently in Collier v. Southern Builders, Inc., 606 So.2d 885 (La.App. 2d Cir.1992). Collier injured his elbow on December 9, 1987. He was treated by many physicians after the accident, but was not told he needed surgery and correctly diagnosed with a disability until May 1989. Collier continued to work as a carpenter until April 1989 when he was forced, due to the pain in his arm, to discontinue his trade. We reversed the trial court, finding that his claim, filed in October 1989, was timely because Collier was not "aware of the significance" of his injury until April 1989 when he could no longer work as a carpenter.
In the instant case, Glascock was forced to quit working at Georgia-Pacific on September 14, 1990, due to substantial pain. On December 21, 1990, Dr. Bailey determined that Glascock suffered from a torn rotator cuff and glenoid labrum and told him that surgery was required. Dr. Bailey stated that he considered Glascock disabled from performing his work as a result of the shoulder injury on September 17, 1990, the date of his admission to Glenwood. Bailey Dep. March 30, 1992, p. 27. As in Loud and Collier, Glascock continued to work in pain, *479 without full apprehension of the extent of his injury, and became aware of its significance, at the earliest, on September 17, when he was admitted to Glenwood and could no longer perform his employment duties because of severe pain. As late as September 10, Dr. Bailey had instructed him to return to work and "resume regular activities." Id. at p. 5. It is clear from this record that neither Glascock nor his physicians comprehended the seriousness of his injury until his pain increased in severity and affected the performance of his job duties to such an extent that he was forced to stop working at Georgia-Pacific. The earliest date which Glascock's injury could have "developed" is September 17, 1990, the date it became manifest to him that he could no longer perform his employment duties in a satisfactory manner. The hearing officer was not clearly wrong to find that the injury did not develop until September 17, and thus did not err in denying Georgia-Pacific's exception of prescription.

Supplemental earnings benefits
By its second assignment, Georgia-Pacific argues that the trial court erred in awarding Glascock SEBs. La.R.S. 23:1221(3)(a) authorizes SEBs where the employee is unable to earn 90 percent or more of his pre-injury wages through any employment or self-employment, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee at the time of the injury was particularly fitted by reason of education, training, and experience. The purpose of SEBs is to compensate the injured employee for the wage earning capacity he has lost as a result of his accident. Pinkins v. Cardinal Wholesale Supply, 619 So.2d 52 (La.1993); Myers v. Stone Container, Inc., 556 So.2d 202 (La.App.2d Cir.), writ. denied, 560 So.2d 30 (1990). Provisions of the worker's compensation law should be liberally construed in favor of the claimant. Pinkins, supra, and citations therein.
Georgia-Pacific cites the following test for determining whether SEBs are mandated:
The claimant in an SEB case must prove by a preponderance of evidence that his work-related injury rendered him unable to earn 90 percent of his pre-injury wages. Once the SEB claimant establishes his prima facie case, the burden shifts to the employer to show that the claimant is physically capable of work and that the work was offered or available in the reasonable geographic region. If the employer meets this burden, then the employee must show by clear and convincing evidence, unaided by any presumption of disability, that he is unable to perform the employment offered or available solely as a consequence of substantial pain. Lubom v. L.J. Earnest, Inc., 579 So.2d 1174 (La.App. 2d Cir.1991). (citations omitted).
Glascock contends that he is unable to earn 90 percent of his pre-accident wages due to his shoulder injury. Georgia-Pacific argues that the evidence shows that Glascock is capable of light duty work, his former job as pallet maker is "light duty" and is still available to him, and he would suffer no loss or change in salary.
Whether an employee has carried his burden of proof is a factual question to be determined by the trier of fact. Loyd v. IMC Fertilizer, Inc., 557 So.2d 1078 (La.App. 2d), writ. denied, 561 So.2d 102 (1990). We will not disturb such a determination absent manifest or clear error. Rosell v. ESCO, supra.
Glascock testified that he has been unable to return to work since September 14, 1990. He testified that he now has trouble even lifting his left arm. This was corroborated by Mr. Procell who found that he was unable to lift his left arm greater than 90 degrees shoulder flexion due to increased pain and recommended that he avoid activities which require this. Because of his shoulder injury, he contends that he cannot resume his former employment duties at Georgia-Pacific. Glascock described in great detail, at trial and in deposition, those duties which he was required to perform as pallet maker for Georgia Pacific. While his primary job was to make pallets, which required dipping 4" cores in glue buckets and placing them on sheets, he was also responsible for stacking these sheets on top of one another, unloading carloads of wax and starch once a *480 month (requiring climbing, and pulling and lifting approximately 50 pounds), and cutting and stacking 4' x 8' sheets of plywood about once a week. These activities require heavy lifting and place significant physical demands on Glascock.
Georgia-Pacific argues that, according to the testimony of Andrea Causey, a personnel clerk at Georgia-Pacific, Glascock's former pallet job was light duty. However, at trial, Ms. Causey was only vaguely familiar with the duties of a pallet maker and merely described one function, making pallets. On the other hand, Glascock, who had performed this job for approximately six months, testified that his job required not only that he make pallets, but also that it demanded a significant amount of lifting.
The record evidence supports the conclusion that Glascock would have difficulty performing these job duties with his present physical limitations. In Mr. Procell's opinion, Glascock was capable of lifting and handling 30 pounds occasionally, 15 pounds frequently and 5-7 pounds constantly. Dr. Bailey diagnosed Glascock with a 10 percent residual disability and recommended that he avoid lifting even light to moderate weight over his shoulders and never more than 20 pounds above shoulder height.
In light of Ms. Causey's questionable testimony, Dr. Bailey's diagnosis of Glascock's residual disability in his shoulder, and the substantial physical limitations noted by both Dr. Bailey and Procell, the hearing officer was not clearly wrong to conclude that the shoulder injury and related disability prevented Glascock from returning to his former pallet-making job at Georgia-Pacific.
The hearing officer also was not clearly wrong to conclude that, although Glascock was capable of working after January 25, 1991, he was unable to earn 90 percent of his pre-injury wages. Contrary to Glascock's claims that he cannot return to any type of work, the record shows that, even with his physical limitations, Glascock is capable of performing some light-medium duty, minimum wage jobs available in his geographic area. There is no record evidence, however, that these jobs would allow him to earn at least 90 percent of his pre-injury wages. Ms. Sledge reported that, "although he may not be able to return to work at the medium duty job that he was performing at Georgia-Pacific, he should be able to make the adjustment to other unskilled work." She suggested positions such as clerk/cashier and warehouse/delivery, and specifically listed Wal-Mart and Sam's as employment available in his locale, but admitted that the salary range for these jobs was only between $5.00 and 6.00 an hour. Glascock's advanced age, limited education and poor literacy skills also diminish his future wage-earning capacity outside of Georgia-Pacific. In fact, the parties stipulated at trial that any job Glascock could perform outside of his job at Georgia-Pacific would be that which would pay minimum wage. Glascock was earning significantly more, $8.265 an hour, before his injury. Based on the record in this case, the hearing officer's conclusion that Glascock was unable to return to his former pallet job and could only perform minimum wage, light duty, unskilled jobs after January 25, 1991 is not manifestly erroneous. Consequently, we find no error in the hearing officer's award of SEBs.

Conclusion
Glascock sustained a developmental injury which did not become manifest to either Glascock or Georgia-Pacific until September 17, 1990. Furthermore, a preponderance of the evidence shows that, due to his work-related shoulder injury, Glascock was temporarily totally disabled until January 25, 1991. Since that date, he has been unable to earn 90 percent of his pre-injury wages and is entitled to SEBs. For the reasons expressed, the judgment is affirmed. Costs of this appeal are assessed to Georgia-Pacific.
AFFIRMED.